**STATE of Alaska, Petitioner,**

v.

**Michele K. DAGUE, Respondent.**

No. A–8914.

Court of Appeals of Alaska.

Sept. 15, 2006.

Before: COATS, Chief Judge, and
MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the United States Supreme Court held that when the maximum sentence for a defendant's crime hinges on an issue of fact, aside from the defendant's prior criminal convictions, the Sixth Amendment to the United States Constitution guarantees the defendant a right to jury trial on this issue of fact, and a right to demand that the government prove this fact beyond a reasonable doubt.[1]

Under the pre-March 2005 version of Alaska's presumptive sentencing law, a sentencing judge was authorized to exceed the prescribed presumptive term only if the State proved one or more of the aggravating factors listed in AS 12.55.155(c), or proved extraordinary circumstances as defined in AS 12.55.165. In our post-*Blakely* decisions, we have repeatedly acknowledged that, with the exception of aggravating factors based solely on a defendant's prior convictions, Alaska's pre–2005 presumptive sentencing law violated the Sixth Amendment right to jury trial recognized in *Blakely* because (1) the pre–2005 law declared that aggravating factors were to be litigated to, and decided by, the sentencing judge rather than a jury, and because (2) the State's burden of proof regarding these aggravating factors was "clear and convincing evidence" rather than "beyond a reasonable doubt".[2]

In the present case, we are asked to decide whether, if *Blakely* entitles a defendant to a jury trial on an aggravating factor listed in AS 12.55.155(c), the defendant likewise has a right to demand grand jury indictment on that aggravating factor—either as a matter of federal law under *Blakely* and its predecessor, *Apprendi v. New Jersey,*[3] or under the grand jury clause of the Alaska Constitution (Article I, Section 8).

1. *Blakely,* 542 U.S. at 301–03, 124 S.Ct. at 2536–37.

2. *See, e.g., Moore v. State,* 123 P.3d 1081, 1091 (Alaska App.2005); *Haag v. State,* 117 P.3d 775, 782 (Alaska App.2005).

3. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

In *Apprendi* and *Blakely*, the Supreme Court held that any distinction between an "element" of the offense and a "sentencing factor" does not alter a defendant's right to jury trial under the Sixth Amendment. That is, *Apprendi* and *Blakely* declare that when a defendant's maximum sentence hinges on an issue of fact (other than a prior conviction), the defendant has a Sixth Amendment right to trial by jury on that issue of fact—regardless of whether state law categorizes that issue of fact as an "element" of the offense or as a "sentencing factor".

The question now before us is whether, in states that have presumptive sentencing laws, *Blakely* has completely erased all legal distinctions between (1) "elements" of a crime and (2) "sentencing factors" which, if proved, increase the upper range of the judge's sentencing authority. If, under *Blakely*, a defendant is entitled to a jury trial on an issue of fact, must that issue of fact be treated as an "element" of the crime for all purposes—including the right to grand jury indictment? Or does *Blakely* allow the states to maintain procedural distinctions between "elements" and "sentencing factors", so long as the defendant's Sixth Amendment right to jury trial is honored?

For the reasons explained here, we conclude that the latter formulation is the correct one. *Blakely* does not require the states to abolish all procedural distinctions between elements and sentencing factors. Moreover, as we also explain here, this Court has repeatedly held that the aggravating factors listed in AS 12.55.155(c) are not elements of the defendant's crime under Alaska law. We therefore conclude that, even though a defendant may have a Sixth Amendment right to a jury trial on an aggravating factor listed in AS 12.55.155(c), the defendant does not have a right to grand jury indictment on that factor.

---

**4.** *See* AS 11.41.120(a) (defining the offense of manslaughter).

**5.** *See* AS 12.55.125(b).

**6.** *See Allen v. State,* 56 P.3d 683, 684–85 (Alaska App.2002).

*The procedural background of this litigation*

Michele K. Dague was prosecuted for second-degree murder when, in 1997, a ten-month-old infant in her care died from massive head trauma. Dague initially claimed that the baby had sustained these injuries by falling from a couch, but Dague later admitted at her trial that she had thrown the baby to the floor.

Given Dague's concession that she had caused the baby's injuries, the issue litigated at Dague's trial was her mental state when she did this. Dague was charged with second-degree murder under AS 11.41.110(a)(2); that is, the State alleged that Dague had acted with extreme indifference to the value of human life. Dague asserted that she had acted unthinkingly—reflexively throwing the baby away from her because the baby's screams were exacerbating her migraine headache.

The jury acquitted Dague of second-degree murder but convicted her of the lesser offense of manslaughter. In other words, the jury found that the State had failed to prove that Dague acted with extreme indifference to the value of human life, but the jury nevertheless concluded that Dague had acted recklessly regarding the possibility that her actions would cause the infant's death.[4]

This manslaughter verdict created a *Blakely* issue. Under Alaska law, defendants convicted of second-degree murder face indeterminate sentencing.[5] Thus, if Dague had been convicted of second-degree murder, the *Blakely* decision would not have affected her sentencing for that crime.[6] But under Alaska law, defendants convicted of manslaughter face presumptive sentencing.[7] Under the pre–1999 version of Alaska's presumptive sentencing law (the version in effect at the time of Dague's offense), Dague (who was a first felony offender) faced a presumptive term of 5 years' imprisonment.[8]

---

**7.** AS 12.55.125(c).

**8.** *See* AS 12.55.125(c)(1) (version in effect in 1997).

(In the superior court, the State took the position that Dague was subject to a 7–year presumptive term under AS 12.55.125(c)(2)(B). This statute imposes a 7–year presumptive term on a first felony offender convicted of manslaughter if "[the defendant's] conduct . . . was knowingly directed towards a child under the age of 16". But Dague's offense occurred in 1997, and AS 12.55.125(c)(2)(B) was not enacted until 1999.[9] Accordingly, this sentencing provision can not be applied to Dague.)

Dague's 5–year presumptive term was the ceiling on the superior court's sentencing authority unless the State proved one or more of the aggravating factors listed in AS 12.55.155(c)—in which case the superior court would have had the authority to sentence Dague to any term of imprisonment up to the statutory maximum (20 years). *See* AS 12.55.155(a) (pre–2005 version) and AS 12.55.125(c) (establishing a sentencing range of 0 to 20 years for class A felonies).

The jury returned its manslaughter verdict on Friday, October 1, 2004. The State asked the superior court to hold the jury until Monday so that the jury could consider aggravating factors relevant to the manslaughter conviction. In response, Dague argued that the State was barred from pursuing aggravating factors because none were alleged in the indictment. She argued in the alternative that, even if aggravating factors did not have to be pleaded in the indictment, she nevertheless had received insufficient notice of the State's proposed aggravating factors.

Superior Court Judge Philip R. Volland ordered the State to provide immediate notice of its proposed aggravating factors, and he agreed to hold the jury over until Monday—at which time he would hear arguments from the parties on two issues: whether aggravators needed to be pleaded in the indictment, and whether it was feasible to delay Dague's jury trial to resolve the various legal issues surrounding the State's post-verdict proposal of aggravating factors.

On Monday, the State announced that it intended to propose one aggravating factor:

AS 12.55.155(c)(5)—that Dague knew or should have known that the victim of her crime was particularly vulnerable.

Dague argued that, because of the United States Supreme Court's decision in *Blakely*, she was entitled to grand jury indictment on any aggravating factor. Dague also contended that she was prejudiced by the lack of pre-trial notice of the proposed aggravator; she asserted that she had been unable to plan her trial strategy so as to counter the proposed aggravator, and she also asserted that the State's post-verdict notice of the aggravator hampered her ability to "make strategic decisions on how to prepare for sentencing". Dague further argued that she was entitled to have the same jury that decided her guilt also decide the proposed aggravating factor, and she contended that the State's post-verdict notice of the aggravator made it impracticable to hold the jurors any longer. For all of these reasons, Dague asked the superior court to discharge the jury and bar the State from pursuing the proposed aggravator.

Judge Volland acceded to Dague's request to discharge the jury, and he further ruled that the State was barred from pursuing its proposed aggravator with any later jury.

Judge Volland concluded that, under Alaska law, a defendant's indictment must allege whatever aggravating factors the State intends to rely on in the event that the defendant is convicted of an offense governed by presumptive sentencing. Judge Volland recognized that Dague's indictment charged her with second-degree murder, an offense not governed by presumptive sentencing, but the judge concluded that the State should have anticipated that Dague would seek jury instructions on the lesser offense of manslaughter, an offense that is governed by presumptive sentencing.

Judge Volland further concluded that Dague would suffer "substantial unfairness" if her trial were continued so as to allow litigation of the proposed aggravating factor. Although Judge Volland agreed with the State that the double jeopardy clause did not necessarily preclude holding a separate jury tri-

9. *See* SLA 1999, ch. 54, § 10.

al on the proposed aggravating factor, the judge concluded that a separate trial would be unfair to Dague under the particular circumstances of her case. Specifically, Judge Volland concluded that, at this second trial, Dague would probably wish to present more testimony from the expert witnesses who, at trial, had given testimony concerning Dague's mental state when she injured the baby. Because these witnesses had already left Alaska, and because it would be expensive to fly them back, Judge Volland concluded that it would be fundamentally unfair to require Dague to gear up for another trial.

Judge Volland then set a sentencing date, intending to sentence Dague to the applicable presumptive term unless Dague proved one or more mitigating factors under AS 12.55.155(d). We granted the State's petition to review Judge Volland's rulings.

*The genesis of the grand jury issue: the adoption of presumptive sentencing in Alaska*

Before Alaska's current criminal code took effect on January 1, 1980,[10] Alaska adhered to a system of indeterminate sentencing. For each criminal offense, the legislature specified a range of sentences (either in the statute defining the offense, or in the statute immediately following).[11] A sentencing judge had the authority to impose any sentence within the specified range.

In the late 1970s, the Alaska Legislature began to reconsider the policy of indeterminate sentencing. The legislature's action was prompted, in part, by the Alaska Judicial Council's publication of a statistical analysis of felony sentencing—a study that found "significant patterns of apparent racial disparities in sentences among many classes of felony offenses".[12]

In 1978, when the legislature enacted a new criminal code for Alaska, the legislature also revised Alaska's sentencing law to include presumptive sentencing.[13] As expanded by a series of legislative amendments and court decisions in the mid–1980s,[14] Alaska's presumptive sentencing law imposed a form of determinate sentencing on most felony offenders—although offenders convicted of the most serious felonies (*e.g.*, murder and kidnapping) still faced indeterminate sentencing.

Alaska was not alone in moving toward determinate sentencing and imposing limits on the sentencing discretion of judges. As Justice O'Connor noted in her dissent in *Blakely*, the United States Congress and numerous state legislatures had enacted laws to limit the sentencing discretion of judges.[15] These laws were based on the perception that judges were "met[ing] out an unjustifiably wide range of sentences to offenders with similar histories [who were] convicted of similar crimes, committed under similar cir-

10. *See* SLA 1978, ch. 166, §§ 3 & 25.

11. For example, the former manslaughter statute, AS 11.15.040, declared that this offense was "punishable by imprisonment in the penitentiary for not less than one year nor more than 20 years". Similarly, the former rape statute (AS 11.15.120) was immediately followed by a penalty statute, AS 11.15.130, which declared that, except in certain cases of incest or sexual intercourse with an underage female, the punishment for rape was "imprisonment in the penitentiary for not more than 20 years nor less than one year". Other examples are former AS 11.15.160 (assault with intent to kill or commit rape or robbery), former AS 11.15.250 (larceny from the person), former AS 11.20.010 (arson in the first degree), and former AS 11.20.100 (burglary not in a dwelling house).

12. This quoted characterization is actually found in the Judicial Council's follow-up study, *Alaska Felony Sentences: 1980* (December 1982), page i.

The Council's original sentencing study was *Alaska Felony Sentencing Patterns: A Multivariate Statistical Analysis (1974–76)* (April 1977).

13. *See* SLA 1978, ch. 166, § 12, which enacted AS 12.55.125 through 12.55.175. The history of presumptive sentencing, and the legislative motivation for enacting this form of sentencing, are recounted in *Juneby v. State*, 641 P.2d 823, 829–830 (Alaska App.1982).

14. *See* SLA 1982, ch. 143, § 28; SLA 1992, ch. 79, § 25. *And see Austin v. State*, 627 P.2d 657 (Alaska App.1981); *Brezenoff v. State*, 658 P.2d 1359 (Alaska App.1983); *Dayton v. State*, 120 P.3d 1073 (Alaska App.2005).

15. *Blakely*, 542 U.S. at 323, 124 S.Ct. at 2548–49 (O'Connor, J., dissenting).

cumstances",[16] and that "these [sentencing] disparities too often were correlated with constitutionally suspect variables such as race".[17]

Some of these determinate sentencing laws—for example, the Federal Sentencing Guidelines and the Washington sentencing laws at issue in *Blakely*—imposed narrow strictures on judges' sentencing discretion, based on a detailed formula that included various aspects of the offender's prior record and the circumstances of the offense. See our discussion of this point in *Cleveland v. State*, 143 P.3d 977, 985–986, Alaska App. Opinion No.2060 (August 25, 2006), 2006 WL 2458578.

In contrast, Alaska's presumptive sentencing law (in its pre-March 2005 version) was essentially a hybrid of indeterminate and determinate sentencing. If no aggravating factors and no mitigating factors were proved, the judge had no authority to deviate from the specified presumptive term of imprisonment. But if at least one aggravating factor was proved, the sentencing became upwardly indeterminate: the judge had the authority to impose any term of imprisonment up to the statutory maximum for that class of felony. And if at least one mitigating factor was proved, the sentencing became downwardly indeterminate: the judge had the authority to go below the presumptive term. *Cleveland*, 143 P.3d at 986, 987.

*This Court's pre-Blakely decisions holding that the aggravating factors listed in AS 12.55.155(c) are not elements of the offense*

In three previous decisions—*Hartley v. State*,[18] *Kelly v. State*,[19] and *State v. District Court*[20]—this Court has held that the aggravating and mitigating factors listed in AS 12.55.155(c)-(d) are not "elements" of a de-

fendant's offense for purposes of pleading. The State normally has the discretion to charge a defendant with a less serious offense, or with a less serious degree of offense, than the facts support. But *Hartley*, *Kelly*, and *State v. District Court* declare that the State has no discretion to ignore or withhold the aggravating factors listed in AS 12.55.155(c).[21] Moreover, these cases declare that a sentencing judge has an independent duty to take account of aggravating factors even if the State has not raised them (and a similar duty to take account of mitigating factors even if the defendant has not raised them).[22] In other words, the aggravating and mitigating factors are not "elements" that the State can charge, or refrain from charging, in its discretion.

Even before our decisions in *Hartley, Kelly*, and *State v. District Court*, the content and structure of Alaska's criminal code (Title 11 of the Alaska Statutes), as well as the content and structure of Alaska's presumptive sentencing statutes in Title 12, suggested that the Alaska Legislature did not intend the aggravating factors listed in AS 12.55.155(c) to be elements of the crimes defined in Title 11.

Chapters 41 through 76 of Title 11 contain traditional definitions of criminal offenses. That is, these chapters contain statutes that define various criminal offenses in terms of a specified combination of conduct, surrounding circumstances, and culpable mental state(s). These same statutes then declare whether the offense is a felony or a misdemeanor, and of what class.

In contrast, the list of aggravating and mitigating factors that apply to presumptive sentencing, and the rules that govern a sentencing court's application of those factors, are contained in AS 12.55, the chapter of Title 12 dedicated to sentencing. The aggravating and mitigating factors apply without

16. *Blakely*, 542 U.S. at 315, 124 S.Ct. at 2544 (O'Connor, J., dissenting), quoting Senate Report No. 98–225 (1983), p. 38, 1983 U.S.Code, Congressional & Administrative News, pp. 3182, 3221.

17. *Blakely*, 542 U.S. at 315, 124 S.Ct. at 2544 (O'Connor, J., dissenting).

18. 653 P.2d 1052 (Alaska App.1982).

19. 663 P.2d 967 (Alaska App.1983).

20. 53 P.3d 629 (Alaska App.2002).

21. *Hartley*, 653 P.2d at 1056; *Kelly*, 663 P.2d at 974–75; *State v. District Court*, 53 P.3d at 633.

22. *Id.*

distinction to nearly all felonies—all felonies except the unclassified felonies listed in AS 12.55.125(a) and (b), for which the legislature retained indeterminate sentencing.

This statutory structure indicated that the legislature did not view the aggravating and mitigating factors listed in AS 12.55.155 as elements which, when present, created higher or lesser degrees of the crimes defined in Title 11. Rather, the aggravating and mitigating factors were apparently viewed as sentencing factors that applied across the board to the sentencing of all felony offenders whose cases were governed by presumptive sentencing.

In comparison, when the legislature wished a mitigating factor to actually lower the degree of the offense, the legislature addressed this matter in Title 11. See, for instance, the legislature's codification of the "heat of passion" defense to murder, AS 11.41.115(a), and the legislature's creation of a lesser degree of kidnapping for offenders who voluntarily release their victims unharmed, AS 11.41.300(d).

Nevertheless, soon after the enactment of presumptive sentencing, this Court was asked to resolve the question of whether the aggravating factors listed in AS 12.55.155(c) should be deemed "elements" of the offense.

This question was presented in *Hartley v. State*, 653 P.2d 1052 (Alaska App.1982). During Hartley's sentencing, the judge noted that the facts of Hartley's case appeared to establish an aggravating factor that had not been raised by the prosecutor. The judge then relied on this aggravator when sentencing Hartley.[23] On appeal, the State conceded that Hartley should have been given advance notice of the judge's proposed aggravator, and a chance to respond to it.[24] However, Hartley argued that the aggravating factor could not be used at all.

Hartley contended that, under Alaska's presumptive sentencing law, a sentencing judge has no authority to raise an aggravating factor *sua sponte*. The premise of Hartley's argument was that aggravating factors should be viewed as elements that increase the severity of a felony offense. Hartley took the position that if the State, for whatever reason, failed to raise a particular aggravating factor, a court had no authority to inject this aggravating element into the case.[25]

Hartley drew an analogy to cases such as *State v. Carlson*, 555 P.2d 269, 271–72 (Alaska 1976) (holding that a superior court judge has no authority to accept a defendant's plea to a lesser offense if the State objects to the reduction of the charge); and *Public Defender Agency v. Superior Court*, 534 P.2d 947, 950–51 (Alaska 1975) (holding that the superior court has no authority to order the Department of Law to initiate and pursue an action for civil contempt when the Department has decided not to pursue the matter). He contended that, under the rationale of these cases, a sentencing judge should be barred from raising a new "element"—that is, a new aggravating factor—if the State failed to raise this factor.

Previous Alaska appellate decisions gave some support to Hartley's argument—in particular, his contention that what appears to be a sentencing factor can actually be an element of the offense.

In *Donlun v. State*, 527 P.2d 472 (Alaska 1974), the defendant was charged with "burglary in a dwelling house" under Alaska's pre–1980 criminal code. The statute at issue, former AS 11.20.080 (quoted in its entirety in *Donlun*, 527 P.2d at 473 n. 2), declared that the normal sentence for this felony was imprisonment "for not less than one nor more than 10 years". However, the statute then declared that if the burglary was committed at nighttime, the maximum punishment was imprisonment for 15 years; and if any person was inside the dwelling during the burglary (whether during the day or at night), the maximum punishment was imprisonment for 20 years.

Although Donlun's offense occurred at night, and at a time when the dwelling was occupied, Donlun's indictment did not specify

---

23. *Hartley,* 653 P.2d at 1055.

24. *Id.* at 1055–56.

25. *Id.* at 1056.

these facts. Nevertheless, the sentencing judge noted that these aggravating circumstances were present in Donlun's case, and the judge apparently concluded that, because of these facts, Donlun could be sentenced to as much as 20 years' imprisonment.[26]

The Alaska Supreme Court concluded that the sentencing judge had committed error by raising these aggravating circumstances *sua sponte*. The court ruled that, under Alaska law, the aggravating circumstances specified in the burglary statute had to be treated as elements of the offense. That is, these aggravating circumstances had to be pleaded in the indictment and proved at trial if the State wanted to subject a burglary defendant to more than 10 years' imprisonment.[27] The supreme court declared: "[When] a criminal statute provides for graded or enhanced ranges of punishment for aggravated instances of the proscribed offense, an indictment charging [that] offense must specify the aggravating facts [if] the defendant [is to be] exposed to an increased range of punishment."[28]

Guided by the principle announced in *Donlun*, this Court reached a similar decision in *Post v. State*, 635 P.2d 1194 (Alaska App. 1981). The defendant in *Post* was indicted under the pre–1980 criminal code for receiving or concealing stolen property.[29] The statute at issue, former AS 11.20.350, declared that this offense was a felony punishable by imprisonment "for not less than one year nor more than three years" if the stolen property exceeded $250 in value, but the maximum punishment was only one year's imprisonment if the stolen property was worth $250 or less. In other words, the lesser degree of this offense was a misdemeanor.

Even though Post's indictment declared that he was charged with the felony version of the offense, the indictment did not specify that the stolen property exceeded $250 in value. We concluded that Post's case was governed by the supreme court's decision in

*Donlun*, and that Post's indictment was therefore not sufficient to subject him to the felony penalty.[30]

But despite the supreme court's decision in *Donlun* and this Court's own decision in *Post*, we rejected Hartley's argument that the aggravating factors listed in AS 12.55.155(c) should be treated as elements of the offense. Instead, we concluded that these statutory aggravating factors differed fundamentally from the elements that might define greater and lesser degrees of a particular offense:

> The state has [the] discretion whether or not to institute a prosecution[, and to decide what degree of the offense to charge]. Once [the state] has obtained a conviction, however, the legislature has established specific guidelines governing [felony] sentencing.... The [legislature's] decision to circumscribe [a court's] sentencing discretion was in large part based upon a legislative belief that greater uniformity in sentencing should be sought and unjustified disparity eliminated.
>
> To allow the parties to ignore [a defendant's] past convictions or [to ignore] aggravating and mitigating factors suggested by the evidence at trial or disclosed in a presentence report prepared by a probation officer would be to encourage unjustified disparity in sentencing. We therefore hold that the state has no discretion to suppress evidence of past convictions or aggravating or mitigating factors.

*Hartley*, 653 P.2d at 1056.

Under *Hartley*, when a sentencing judge perceives that aggravating or mitigating factors apply in a presumptive sentencing case, the judge must consider these factors even if the parties have not recognized their applicability or argued their importance. *Hartley* holds that these aggravating and mitigating factors are not elements that the State, in the exercise of its prosecutorial discretion, can choose to pursue or ignore. Rather, to advance the goal of eliminating unjustified

---

26. *Donlun,* 527 P.2d at 473–74 & n. 4.

27. *Id.* at 474.

28. *Id.* at 473.

29. *Post,* 635 P.2d at 1195.

30. *Id.* at 1196–97.

disparities in sentencing, the legislature requires sentencing courts to consider these aggravating and mitigating factors whenever they are established by the record.

We addressed this issue again the following year in *Kelly v. State*, 663 P.2d 967 (Alaska App.1983). In *Kelly*, we declared:

> The legislature did not intend the presumptive sentencing provisions of the revised criminal code to be applied optionally, at the discretion of the court or the prosecution. The presumptive sentencing structure is mandatory, and it must be followed when it applies.

*Kelly*, 663 P.2d at 974. And we last revisited this issue in *State v. District Court*, 53 P.3d 629 (Alaska App.2002), where we reiterated that "in cases governed by presumptive sentencing, neither the prosecutor nor the sentencing judge has the power to ignore a defendant's undisputed prior felony convictions or the existence of plainly applicable aggravating or mitigating factors." [31]

To summarize this discussion: Our decisions in *Hartley*, *Kelly*, and *State v. District Court* hold that the aggravating and mitigating factors listed in AS 12.55.155(c)-(d) are not "elements" of the defendant's offense for purposes of pleading. The State has no discretion to ignore or withhold aggravating factors. Moreover, a sentencing judge has an independent duty to take account of aggravating factors even if the State has not raised them, and the judge must likewise take account of mitigating factors even if the defendant has not raised them.

Admittedly, *Hartley*, *Kelly*, and *State v. District Court* were all decided before *Blakely*. But unless *Blakely* now requires a differ-ent rule, our decisions in *Hartley*, *Kelly*, and *State v. District Court* remain binding law on the issue of whether the aggravating factors listed in AS 12.55.155(c) constitute elements of a defendant's underlying felony offense for purposes of pleading. In other words, unless *Blakely* requires a different rule, the law in Alaska is that these aggravating factors are not elements of a felony offense which must be pleaded in an indictment.

*The United States Supreme Court's decisions in Apprendi, Blakely, and Booker—the Court's adoption of a functional test for assessing when the Sixth Amendment guarantees defendants the right to a jury trial on a particular issue of fact*

In *Apprendi v. New Jersey*,[32] the United States Supreme Court held that, under the Sixth Amendment to the United States Constitution, a criminal defendant has the right to a jury trial, and to proof beyond a reasonable doubt, on any issue of fact which, if proved, will subject the defendant to a higher maximum penalty.

*Apprendi* was a significant expansion of Sixth Amendment rights. However, it was not a bolt from the blue.

For decades, state legislatures had been enacting statutes that either established a mandatory minimum sentence or, alternatively, established a higher maximum sentence based on a particular aggravating circumstance—usually, the defendant's possession or use of a firearm or other dangerous weapon.[33]

Because of these sentencing statutes, many state courts were asked to decide whether defendants had a right to trial by

---

**31.** *State v. District Court*, 53 P.3d at 633.

**32.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**33.** For an example of a statute establishing a mandatory minimum penalty for certain felonies when the defendant possessed or used a firearm, see the statute at issue in *Whitton v. State*, 479 P.2d 302 (Alaska 1970). This statute imposed a mandatory minimum sentence of 10 years' imprisonment on any defendant convicted of "robbery, assault, murder, rape, burglary, or kidnapping" if the defendant "use[d] or carrie[d] a firearm" during the commission of the offense.

(This statute is quoted *verbatim* in *Whitton*, 479 P.2d at 304 n. 2.) For an example of a statute imposing an additional penalty for the possession or use of a dangerous weapon during the commission of a felony, see the statute at issue in *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). This statute provided that, in addition to the prescribed penalty for a felony offense, a felony defendant faced a supplemental term of imprisonment if the defendant committed the offense "by, with, or through the use, assistance, or aid of a dangerous or deadly weapon". (This statute is quoted in *Hunter*, 459 U.S. at 362, 103 S.Ct. at 676.)

jury on the aggravating circumstance that triggered the mandatory minimum sentence or that triggered the additional term of imprisonment. We addressed this body of case law in *Huf v. State,* 675 P.2d 268 (Alaska App.1984).

In *Huf,* we cited the Kansas Court of Appeals's decision in *State v. Kleber,* 2 Kan. App.2d 115, 575 P.2d 900 (1978), as an accurate summary of the decisions in this area.[34] The defendant in *Kleber* was subject to a mandatory minimum term of imprisonment because he used a firearm during the commission of his offense.[35] Under Kansas law, the sentencing judge decided the question of whether the defendant used a firearm. Kleber argued that this law was unconstitutional—that, as a matter of due process, he was entitled to a jury trial on this issue.[36]

In rejecting Kleber's argument, the Kansas court distinguished between (1) statutes that imposed a mandatory minimum sentence, *within* the otherwise applicable range of sentences, based on the defendant's possession or use of a firearm, and (2) statutes that imposed an additional term of imprisonment, *over and above* the otherwise applicable range of sentences, based on the defendant's possession or use of a firearm:

> The cases [which hold that a defendant is entitled to have a jury decide whether the government has proved the aggravating circumstance] concern statutes ... wherein an *additional* and enhanced sentence may be imposed upon a defendant who commits a crime with a firearm. Such statutes frequently provide that one who commits a felony with a firearm may receive a separate sentence for the use of the firearm in addition to whatever sentence may be imposed for the felony. In construing such statutes, [courts hold] that the question as to whether a firearm was used must be determined by the trier of fact before the additional sentence may be imposed [because these] statutes define a

new class of crimes by adding a new element, use of a firearm, and the existence of the new element requires an additional finding of fact.

> We believe [that the statute at issue here] is distinguishable from those statutes of other jurisdictions.... [The Kansas sentencing statute] has the effect of imposing a mandatory minimum sentence for all Article 34 crimes in which the defendant used a firearm in the commission of the crime.... While [our statute] limits the range of authorized dispositions available to the trial court in some instances, it does not create a new class of crimes, add a new element to the statutory definition of already existing crimes, or provide for an additional sentence. Use of a firearm under the statute is not made an element of the offense charged, and is only pertinent to the authorized disposition the court may consider in the event of a conviction.

*Kleber,* 575 P.2d at 904 (emphasis added).[37]

Compare the Oregon Supreme Court's contemporaneous decision in *State v. Wedge,* 293 Or. 598, 652 P.2d 773 (1982), construing a statute that imposed a mandatory minimum sentence of either 5, 10, or 30 years' imprisonment (depending on the defendant's prior record) if the defendant used or threatened to use a firearm during the commission of a felony.[38] This prescribed "minimum" term of imprisonment applied even if the maximum sentence for the underlying offense was *less* than the specified minimum. In other words, this sentencing statute increased the defendant's maximum penalty in many instances.[39]

The Oregon court held that, under this statute, the defendant's use of a firearm constituted an element of the offense—and, thus, the defendant was entitled to a jury trial on this issue:

> Although the challenged statute is denominated an enhanced penalty statute, in effect it creates a new crime. The [defendant's] jury only considered ... the ques-

---

34. *Huf,* 675 P.2d at 272.

35. *Kleber,* 575 P.2d at 904.

36. *Id.*

37. Quoted in *Huf,* 675 P.2d at 272.

38. Oregon Statute 161.610 (1979), described in *Wedge,* 652 P.2d at 776.

39. *Wedge,* 652 P.2d at 778.

tion of first degree robbery, and [they] convicted him of that offense, but the defendant was [effectively] sentenced [for] "first degree robbery using a firearm." If the legislature had actually described the crime as "first degree robbery using a firearm"[,] the use of a firearm would certainly be an element and there would be no doubt [that the] defendant would have a right to a jury determination of [his] guilt. The legislature cannot eliminate constitutional protections by separating and relabeling [one or more] elements of a crime.

*Wedge*, 652 P.2d at 778.

From our decision in *Huf*, the Kansas decision in *Kleber*, and the Oregon decision in *Wedge*, it is clear that, well before the United States Supreme Court issued its decision in *Apprendi*, state courts were dealing with the question of whether a criminal defendant had a right to trial by jury on issues of fact that altered the sentencing range to the defendant's detriment. Nevertheless, even though the issue presented in *Apprendi* was not new, the Supreme Court's analysis of this issue in *Apprendi* represents a new direction in jury trial jurisprudence.

As can be seen from the decisions in *Huf*, *Kleber*, and *Wedge*, state court decisions before *Apprendi* analyzed this issue by asking whether the sentence-enhancing issue of fact was truly a "sentencing factor" or whether, instead, it should be deemed an "element" of what was, in effect, a higher degree of the charged crime. In *Apprendi*, the Supreme Court changed the legal landscape by declaring that, for purposes of the Sixth Amendment right to jury trial, this distinction between "sentencing factor" and "element" is irrelevant.

The defendant in *Apprendi* was convicted under New Jersey law of "possession of a firearm for an unlawful purpose" after he fired several shots into the home of an African–American family who had recently moved into his neighborhood.[40] The normal range of punishment for this offense was imprisonment for "between five years and 10 years".[41] However, under New Jersey's "hate crime" law, Apprendi became subject to an enhanced sentencing range of 10 to 20 years' imprisonment after the sentencing judge found that Apprendi acted for the purpose of intimidating his victims because of their race.[42] Using this 10–20 year sentencing range, the judge sentenced Apprendi to 12 years' imprisonment.[43]

Apprendi appealed his sentence, arguing that he was entitled to have a jury decide whether he had acted with the intent to intimidate his victims on account of their race. As we just explained in our discussion of *Huf*, *Kleber*, and *Wedge*, most state courts followed the rule of construction that issues of fact which increased the defendant's maximum sentence should be deemed "elements" of a higher degree of offense—meaning that defendants were entitled to a jury trial on these issues. But when Apprendi's case came before the New Jersey Supreme Court, the New Jersey court reached the opposite result: they held that the "hate crime" law was merely a sentence enhancement provision, and that Apprendi therefore had no right to a jury trial on the question of his motive for the shooting.[44]

The United States Supreme Court reversed the New Jersey decision because the Supreme Court held that, under the Sixth Amendment, defendants are entitled to a jury trial, and to proof beyond a reasonable doubt, on "any fact (other than a prior conviction) that increases the maximum penalty for a crime".[45]

For present purposes, the most important aspect of *Apprendi* is that the Supreme Court refused to base its decision on a "sentencing factor"/"element" dichotomy.

Writing for the majority, Justice Stevens declared that "using the label 'sentence enhancement' to describe [the effect of the New

40. *Apprendi*, 530 U.S. at 468–69, 120 S.Ct. at 2351.

41. *Id.*, 530 U.S. at 468, 120 S.Ct. at 2351.

42. *Id.*, 530 U.S. at 468–69, 471, 120 S.Ct. at 2351, 2352.

43. *Id.*, 530 U.S. at 471, 120 S.Ct. at 2352.

44. *Id.*, 530 U.S. at 472–73, 120 S.Ct. at 2353–54.

45. *Id.*, 530 U.S. at 476, 120 S.Ct. at 2355.

Jersey hate crime law] does not provide a principled basis" for deciding whether defendants are entitled to a jury trial on the issues of fact raised by that hate crime law.[46]

Justice Stevens noted that "[a]ny possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed [when the Sixth Amendment was enacted]."[47] However, Justice Stevens acknowledged that "[these] practices [might] change and still remain true to the principles of [the Constitution]."[48]

Justice Stevens further acknowledged that, in *McMillan v. Pennsylvania*[49] (a case in which the Supreme Court upheld a statute that imposed a minimum term of imprisonment based on facts found by the sentencing judge), the Supreme Court itself used the term "sentencing factor" to "refer to a fact that was not found by a jury but that could affect the sentence imposed by the judge".[50] However, Justice Stevens declared that the *McMillan* decision did not "budge from the position" that "serious constitutional concern[s]" are raised whenever "a state scheme ... keeps from the jury facts that expose defendants to greater or additional punishment".[51]

Responding to the State of New Jersey's argument that the contested issue in Apprendi's case was a "sentencing factor" rather than an "element" because this issue of fact merely concerned Apprendi's "motive" for committing the crime (his alleged intent to intimidate his victims on account of their race),[52] Justice Stevens declared that "it does not matter whether the required finding [of fact] is characterized as one of intent [*i.e.*,

culpable mental state] or of motive, because labels do not afford an acceptable answer" to the question of a defendant's right to jury trial.[53] It is likewise unacceptable, Justice Stevens stated, to have a defendant's right to jury trial hinge on "the constitutionally novel and elusive distinction between 'elements' and 'sentencing factors'."[54]

Justice Stevens stated that, to him and the other members of the *Apprendi* majority, it was clear that the contested issue of fact in Apprendi's case was indeed an "element".[55] Nevertheless, in that same sentence, Justice Stevens declared that the distinction between "sentencing factor" and "element" was *not* the relevant inquiry. Rather, "the relevant inquiry is [whether] the required finding expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict".[56]

In other words, regardless of how one might characterize a particular issue of fact within the dichotomy of "sentencing factor" and "element", the test for Sixth Amendment purposes is a different one. A defendant's right to jury trial under the Sixth Amendment does not hinge on how state law categorizes a particular issue of fact; rather, the defendant's right to jury trial hinges on whether a finding in the government's favor will increase the defendant's maximum sentence: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the [otherwise] prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[57] Or, as Justice Scalia put it in *Blakely v. Washington*,[58] the test is whether the defendant's sentence was authorized by "the jury's verdict alone" or, instead, the sentencing court "acquire[d] [its] authority only upon

**46.** *Id.*

**47.** *Id.,* 530 U.S. at 478, 120 S.Ct. at 2356.

**48.** *Id.,* 530 U.S. at 483, 120 S.Ct. at 2359.

**49.** 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

**50.** *Apprendi,* 530 U.S. at 485, 120 S.Ct. at 2360.

**51.** *Id.,* 530 U.S. at 486, 120 S.Ct. at 2360.

**52.** *See id.,* 530 U.S. at 492, 120 S.Ct. at 2363–64.

**53.** *Id.,* 530 U.S. at 494, 120 S.Ct. at 2365.

**54.** *Id.*

**55.** *Id.*

**56.** *Id.*

**57.** *Id.,* 530 U.S. at 490, 120 S.Ct. at 2362–63.

**58.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

finding some additional fact" beyond those found by the jury.[59]

Justice Stevens returned to this theme—that the labels "sentencing factor" and "element" are irrelevant for Sixth Amendment purposes—in *United States v. Booker.*[60] Writing for the Court, Justice Stevens declared that the decision in *Apprendi* was based on the need to give renewed meaning to two basic constitutional protections: a defendant's right to demand "proof beyond a reasonable doubt of every fact necessary to constitute the crime ... charged",[61] and a defendant's right "to demand that a jury [decide whether the defendant is] guilty of all the elements of the crime ... charged".[62]

The key problem, Justice Stevens said, was the erosion of the jury's traditional role in determining a criminal defendant's level of guilt, as more and more states (and the federal government) adopted determinate sentencing schemes—sentencing schemes that gave judges the power to resolve the factual disputes that would determine the upper limit of the defendant's punishment:

> It is quite true that[, under indeterminate sentencing schemes,] judges commonly determined facts justifying [their] choice of a heavier sentence.... [But in] 1986, [we] first recognized a new trend in the legislative regulation of sentencing[: sentencing laws under which] facts selected by legislatures ... not only authorized, or even mandated, heavier sentences than would otherwise have been imposed, but increased the range of sentences possible for the underlying crime....
>
> The effect of the increasing emphasis on facts that enhanced [the permitted] sentencing ranges ... was to increase the judge's power and diminish that of the jury. It became the judge, not the jury, who determined the upper limits of sentencing, and the facts [that] determined [the sentencing range] were not required

to be raised before trial or proved by more than a preponderance [of the evidence].

*Booker*, 543 U.S. at 236, 125 S.Ct. at 751 (citations omitted).

Justice Stevens explained that, given this development in sentencing law, "the Court was faced with the issue of preserving [the] ancient guarantee [of jury trial] under a new set of circumstances":

> The new sentencing practice forced the Court to address the question [of] how the right of jury trial could be preserved [so that it would continue to guarantee], in a meaningful way[,] ... that the jury would still stand between the individual and the power of the government under the new sentencing regime. [I]t is the new circumstances ... that have led us to the answer ... developed in *Apprendi* and subsequent cases[,] culminating with this one. It is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance.

*Booker*, 543 U.S. at 237, 125 S.Ct. at 752.

The answer, as explained in *Apprendi* and *Blakely*, was to interpret the Sixth Amendment so as to guarantee a right of jury trial, and a right to demand proof beyond a reasonable doubt, on any issue of fact which, if proved, "increases the penalty for the [defendant's] crime beyond the [otherwise] prescribed statutory maximum".[63]

Justice Stevens then reiterated what he said in *Apprendi:* for purposes of this Sixth Amendment rule, the labels "element" and "sentencing factor" are irrelevant. These labels do not provide a principled basis for resolving the question of whether the Sixth Amendment guarantees a right to jury trial on a particular issue of fact:

> The fact that[, in *Apprendi*,] New Jersey labeled [its] hate crime a "sentence enhancement" rather than a separate crimi-

---

**59.** *Blakely*, 542 U.S. at 305, 124 S.Ct. at 2538.

**60.** 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**61.** *Booker*, 543 U.S. at 230, 125 S.Ct. at 748, quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).

**62.** *Id.*, 543 U.S. at 230, 125 S.Ct. at 748, quoting *United States v. Gaudin*, 515 U.S. 506, 511, 115 S.Ct. 2310, 2314, 132 L.Ed.2d 444 (1995).

**63.** *Booker*, 543 U.S. at 231, 125 S.Ct. at 748, quoting *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63.

nal act was irrelevant for constitutional purposes. As a matter of simple justice, it seemed obvious that the procedural safeguards [of jury trial and proof beyond a reasonable doubt] designed to protect Apprendi from punishment for [the underlying crime of] possession of a firearm should apply equally to his violation of the hate crime statute. Merely using the label "sentence enhancement" to describe [the hate crime statute] did not provide a principled basis for treating the two crimes differently.

In *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), we reaffirmed our conclusion that [a legislature's] characterization of critical facts is constitutionally irrelevant. There, we held that it was impermissible for "the trial judge, sitting alone"[,] to determine the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty.... Our opinion [in *Ring* ] made it clear that[,] ultimately, ... the characterization of a fact or circumstance as an "element" or a "sentencing factor" is not determinative of the question [of whether a] judge or jury [decides that issue of fact].

*Booker*, 543 U.S. at 231, 125 S.Ct. at 748–49 (internal quotations and citations omitted).

In sum: Even though pre-*Apprendi* decisions like *Huf, Kleber,* and *Wedge* relied on the distinction between "elements" and "sentencing factors" to resolve the scope of a defendant's right to jury trial, the *Apprendi* decision adopted a new approach to this question. Instead of asking whether a particular issue of fact represented an "element" or a "sentencing factor", the *Apprendi* Court asked a different question: whether resolution of this issue of fact in favor of the government would increase the defendant's maximum sentence. If so, then the Sixth Amendment guarantees the defendant a right to jury trial on that issue, no matter how the issue might be classified.

*Although the Supreme Court declared in Apprendi, Blakely, and Booker that the distinction between "elements" and "sentencing factors" is irrelevant when assessing a defendant's right to jury trial under the Sixth Amendment, the states can continue to rely on this distinction in matters of pleading and proof not governed by the Sixth Amendment right to jury trial*

The issue presented to this Court in the present case is whether a defendant has a right to grand jury indictment on any aggravating factor listed in AS 12.55.155(c) which, in the event the defendant is convicted, will later be litigated at the defendant's sentencing. The Supreme Court's decisions in *Apprendi, Blakely,* and *Booker* do not answer this question.

In *Apprendi, Blakely,* and *Booker*, the Supreme Court did not say that the states are forbidden from drawing any distinction between "elements" and "sentencing factors". Rather, as explained in the preceding section of this opinion, the Supreme Court declared that any such distinction under state law is irrelevant when assessing whether the Sixth Amendment guarantees defendants a right to jury trial on a particular issue of fact.

The Supreme Court further clarified this point in *Schriro v. Summerlin*, 542 U.S. 348, 354–55, 124 S.Ct. 2519, 2524, 159 L.Ed.2d 442 (2004). In *Summerlin*, the Supreme Court explained that it did not view *Apprendi* and *Blakely* as requiring a redefinition of state criminal offenses, or as requiring a modification of the elements of those offenses.

The *Summerlin* case arose from the Supreme Court's earlier decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In *Ring*, the Court held that, under *Apprendi*, a defendant was entitled to a jury trial on the aggravating factors that authorized imposition of the death penalty.[64] The question presented in *Summerlin* was whether the federal courts should apply *Ring* retroactively—that is, whether the federal courts should grant habeas corpus relief to state prisoners whose convictions were final before *Ring* was decided.[65] This ques-

---

64. *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443.

65. *Summerlin*, 542 U.S. at 349, 124 S.Ct. at 2521.

tion, in turn, hinged in part on whether the *Ring* decision announced a "substantive" rule or merely a "procedural" rule for purposes of the retroactivity test announced in *Teague v. Lane.*[66]

In *Summerlin,* the Supreme Court declared that *Ring* had not worked any substantive change in Arizona law, but had merely announced a rule of procedure:

> A decision that modifies the elements of an offense is normally substantive rather than procedural. New elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa. [Citation omitted] But that is not what *Ring* did; the range of conduct punished by death in Arizona was the same before *Ring* as after. *Ring* held that, *because* Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators *effectively were* elements for federal constitutional purposes, and so were subject to the procedural requirements the Constitution attaches to trial of elements. 536 U.S. [at] 609, 122 S.Ct. [at 2443].

*Summerlin,* 542 U.S. at 354, 124 S.Ct. at 2524 (emphasis in the original).

In other words, even though, under *Apprendi* and *Blakely,* a defendant may be entitled to a jury trial on a particular issue of fact, this does not mean that this issue of fact must be treated as an "element" for all purposes. Because Dague's case raises a question involving the right to grand jury indictment, rather than the right to jury trial, *Apprendi* and *Blakely* do not provide the answer to Dague's case.

It is true that *Apprendi* contains a lengthy discussion of a defendant's right at common law to grand jury indictment on any issue of fact that would increase the defendant's potential punishment. *See Apprendi,* 530 U.S. at 477–481, 120 S.Ct. at 2356–58. But this discussion is simply background—part of the Court's explanation of why the Court chose to adopt an analogous interpretation of the Sixth Amendment right to jury trial.

It is also true that the *Apprendi* opinion refers to a defendant's right to grand jury indictment under the Fifth Amendment:

> Our answer to [the] question [of whether Apprendi was entitled to a jury trial] was foreshadowed by our opinion in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), construing a federal statute. We there noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than [a] prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.,* at 243, n. 6, 119 S.Ct. 1215. The Fourteenth Amendment commands the same answer in this case involving a state statute.

*Apprendi,* 530 U.S. at 476, 120 S.Ct. at 2355.

But the final sentence of this quoted excerpt is not an accurate statement of the law. Although the Fifth Amendment guarantees a right of grand jury indictment in federal prosecutions, the Fourteenth Amendment does not "command the same answer" in state prosecutions. Over one hundred years ago, in *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), the Supreme Court held that the due process clause of the Fourteenth Amendment does not include the right to grand jury indictment.

■ Because the Sixth Amendment right to jury trial is incorporated in the due process clause of the Fourteenth Amendment,[67] the Fourteenth Amendment does indeed "command the same answer" in both federal and state prosecutions when the question is a defendant's right to jury trial. But persons prosecuted for crimes in state court have no federal right to grand jury indictment.[68]

---

**66.** *Id.,* 542 U.S. at 351–53, 124 S.Ct. at 2522–23; *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**67.** *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

**68.** *Ned v. State,* 119 P.3d 438, 444–45 (Alaska App.2005).

In fact, later on in the *Apprendi* opinion, the Court clarified this matter by explicitly stating that it did not intend to address the issue of a defendant's potential right to grand jury indictment:

> Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment. He relies entirely on the fact that the "due process of law" that the Fourteenth Amendment requires the States to provide to persons accused of crime encompasses the right to a trial by jury, *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and the right to have every element of the offense proved beyond a reasonable doubt, *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). That Amendment has not, however, been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury".... We thus do not address the indictment question ... today.

*Apprendi,* 530 U.S. at 477 n. 3, 120 S.Ct. at 2356 n. 3.

We do not mean to say that the decisions in *Apprendi* and *Blakely* have no bearing on a defendant's right to notice and an opportunity to prepare for litigation. If, under the Sixth Amendment, a defendant is entitled to a jury trial on a particular issue of fact, it would stand to reason that the defendant is likewise entitled to advance notice that this fact will be litigated, and to a sufficient opportunity to prepare for that litigation. But the Supreme Court's decision in *Hurtado* stands for the proposition that, for purposes of the Fourteenth Amendment, these due process concerns can be satisfactorily addressed by procedures short of grand jury indictment.

We also acknowledge that, in many of our prior decisions, we have characterized *Apprendi, Blakely,* and *Booker* as standing for the proposition that a "sentencing factor" which increases the defendant's potential maximum sentence must be viewed as if it constituted an element of the offense.[69] Indeed, the United States Supreme Court used the phrase "functional equivalent of an ele-

ment" in *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. at 2365 n. 19, and again in *Ring v. Arizona,* 536 U.S. at 609, 122 S.Ct. at 2443, when the Court referred to the aggravating factors that, under Arizona law, made a defendant eligible to receive the death penalty.

But while this characterization may be accurate enough for purposes of Sixth Amendment analysis, it is potentially misleading when applied in other contexts. As we have explained here, the decisions in *Apprendi, Blakely,* and *Booker* do not rest on the notion that some "sentencing factors" are really "elements". Rather than trying to answer the question of whether some sentencing factors must be deemed elements, the Supreme Court cut the Gordian knot by declaring that the distinction between "elements" and "sentencing factors" was irrelevant for Sixth Amendment purposes.

■ Under the functional test of *Apprendi, Blakely,* and *Booker,* defendants have a right to jury trial on any issue of fact, regardless of whether it is designated as an "element" or a "sentencing factor", if proof of that fact will increase the defendant's maximum sentence. But the Supreme Court did not say that the Sixth Amendment forbids the states from employing the distinction between "elements" and "sentencing factors" for other purposes.

As we have already explained, this Court has repeatedly ruled—in *Hartley,* in *Kelly,* and in *State v. District Court*—that, as a matter of state law, the aggravating factors listed in AS 12.55.155(c) are *not* elements of a felony offense, but rather are sentencing factors that a judge must consider whenever they are applicable, even if the State has failed to raise them. Although *Apprendi* and *Blakely* guarantee defendants a right to jury trial on aggravating factors in some instances, *Apprendi* and *Blakely* do not abrogate the underlying classification of aggravators and mitigators under AS 12.55.155 as "sentencing factors" rather than "elements" under Alaska law.

---

**69.** See, for example, *Carlson v. State,* 128 P.3d 197, 204 (Alaska App.2006).

*Even when, under Apprendi and Blakely, a defendant has a right to jury trial on an aggravating factor—and, thus, a right to advance notice of the aggravating factor and a fair opportunity to prepare to litigate it—the federal Constitution does not require the states to provide this notice at the grand jury stage of the proceedings*

*Apprendi*, *Blakely*, and *Booker* implicitly require the states to provide defendants with advance notice of any factor (regardless of how this factor is designated) that will potentially increase the defendant's maximum sentence. The question is whether the federal Constitution requires the states to give this advance notice at the grand jury stage of the proceedings.

*Apprendi*, *Blakely*, and *Booker* do not provide an answer to this question. But other decisions of the United States Supreme Court suggest that even when aggravating factors must be proved to a jury, the states are free, at least in many instances, to craft procedures that allow post-trial notification of these aggravating factors and a separate, second jury trial to decide these factors if they are contested.

In *Graham v. West Virginia*, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912), and again in *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), the Supreme Court was asked to assess the constitutionality of West Virginia's "habitual criminal" law—a law that provided substantially increased penalties for a felony offense if the defendant had a particular number of prior felony convictions.

The West Virginia statute specified a mandatory life sentence upon a person's third felony conviction.[70] Under West Virginia law, the charge of "habitual criminal" was not a separate offense; rather, the fact that a defendant was a "habitual criminal" increased the sentence that the defendant faced for their current felony. Moreover, a defendant was entitled to a jury trial if they disputed the fact of their prior felony convictions.[71] But state law nevertheless allowed the prosecutor to raise the issue of the defendant's prior felony convictions *after* the de-

fendant was convicted of the current offense, in preparation for the defendant's sentencing. As described by the Supreme Court, West Virginia law "provided that the [habitual criminal] statute should be invoked by information filed after [the defendant's] conviction rather than by allegation in the indictment upon which the [defendant] was being prosecuted for a substantive offense."[72]

In both *Graham* and *Oyler*, the Supreme Court declared that this procedure did not violate either the due process clause or the double jeopardy clause.

The Supreme Court's decision in *Graham* is particularly important on the issue of whether the federal due process clause demands that aggravating factors be alleged in the indictment. The defendant in *Graham* contended that, because the existence of the prior convictions would make such a significant difference to the defendant's sentence, the government should be required to declare in the indictment whether it intended to ask the court to sentence the defendant as a "habitual criminal" if the defendant was convicted. The Supreme Court acknowledged that it might be more "convenient" to have the State allege the defendant's prior convictions in the original indictment, so that the same jury could decide all issues in a single trial. But the Court declared that such a practice "is not obligatory":

> It cannot be said that the prisoner was deprived of due process of law because the question [of his] former conviction was passed upon separately. While it is [a] familiar practice to set forth in the indictment the fact of [a] prior conviction of another offense, and to submit to the jury the evidence upon that issue, together with that relating to the commission of the crime which the indictment charges, still in its nature it is a distinct issue, and it may appropriately be the subject of separate determination. Provision for a separate and subsequent determination of [this issue] has not been regarded as a deprivation of any fundamental right.

---

**70.** *Oyler*, 368 U.S. at 449, 82 S.Ct. at 502.

**71.** *Id.*, 368 U.S. at 453, 82 S.Ct. at 504.

**72.** *Id.*, 368 U.S. at 452 n. 5, 82 S.Ct. at 503 n. 5.

. . .

This conclusion necessarily follows from the distinct nature of the issue [*i.e.,* the existence of the defendant's prior convictions] and from the fact . . . that it does not relate to the commission of the offense, but goes to the punishment only, and therefore it may be subsequently decided. *Graham,* 224 U.S. at 625, 629, 32 S.Ct. at 586, 588.

Fifty years later, the Supreme Court reiterated this theme in *Oyler.* The defendants in *Oyler* again argued that the West Virginia procedure violated their right to procedural due process under the Fourteenth Amendment—that they were constitutionally entitled to notice of the habitual criminal accusation before their trial on the third felony offense.[73]

The Supreme Court disagreed:

Even though an habitual criminal charge does not state a separate offense, the determination of whether one is an habitual criminal is essentially independent of the determination of guilt on the underlying substantive offense. [Citation and internal quotation marks omitted] Thus, although the habitual criminal issue may be combined with the trial of the felony charge, "it is a distinct issue, and it may appropriately be the subject of separate determination." *Graham v. West Virginia,* 224 U.S. 616, 625, 32 S.Ct. 583, 586, 56 L.Ed. 917 (1912). If West Virginia chooses to handle the matter as two separate proceedings, due process does not require advance notice that the trial on the substantive offense will be followed by an habitual criminal proceeding.

*Oyler,* 368 U.S. at 452, 82 S.Ct. at 503–04 (internal quotations and citations omitted).

The Supreme Court noted that "[a]ny other rule would place a difficult burden on the [state's] imposition of a recidivist penalty":

Although the fact of prior conviction is within the knowledge of the defendant, often this knowledge does not come home to the prosecutor until after the trial, and in many cases the prior convictions are not discovered until the defendant reaches the penitentiary.

*Oyler,* 368 U.S. at 452 n. 6, 82 S.Ct. at 504 n. 6.

The Supreme Court acknowledged that defendants prosecuted under the habitual criminal law were entitled to "reasonable notice and an opportunity to be heard relative to the recidivist charge". But the Court held that the due process clause of the Fourteenth Amendment did not require that "[this] notice be given prior to the [defendant's] trial on the substantive offense".[74]

*Oyler* is not a relic of Nineteenth Century jurisprudence. Rather, *Oyler* was decided in 1962—during a time when the Supreme Court was aggressively expanding the rights of criminal defendants under the federal constitution.[75] It presumably continues to be good law.

Two particular aspects of the *Graham* and *Oyler* decisions need to be emphasized.

First, although West Virginia law imposed increased penalties on defendants based on their prior felony convictions, the Supreme Court did *not* uphold the West Virginia law under a theory analogous to the *Apprendi–Blakely* exemption for prior convictions. West Virginia law expressly provided that, if a defendant contested the existence of the predicate prior felony convictions, the defendant was entitled to a jury trial on that issue. Thus, there was no dispute in *Graham* and *Oyler* concerning the defendant's right to jury trial. The issue was whether, in light of that right to jury trial, the defendant was entitled to pre-conviction notice that the State would seek enhanced punishment under the habitual criminal statute if the defendant was convicted.

Second, although the West Virginia law at issue in *Graham* and *Oyler* called for increased penalties based on a defendant's prior felony convictions, the Supreme Court's stated rationale for upholding West Virginia's procedure (*i.e.,* the procedure of having

---

**73.** *Id.,* 368 U.S. at 451–52, 82 S.Ct. at 503.

**74.** *Id.,* 368 U.S. at 452, 82 S.Ct. at 504.

**75.** *See Grinols v. State,* 10 P.3d 600, 610 n. 25 (Alaska App.2000).

a separate, post-conviction jury trial if the defendant disputed those prior convictions) actually suggests a rule that is not confined to prior convictions. The Supreme Court noted that "the determination of whether one is an habitual criminal is essentially independent of the determination of [the defendant's] guilt on the underlying substantive offense." The Court declared that, because the existence of prior convictions "is a distinct issue, . . . it may appropriately be the subject of separate determination" (again, by jury trial) if that is how a state chooses to handle the issue. *Oyler*, 368 U.S. at 452, 82 S.Ct. at 503–04.

The Supreme Court's explanation of this point is significant because many of the aggravating factors listed in AS 12.55.155(c) hinge on matters that appear to be "essentially independent of the determination of [the defendant's] guilt on the underlying substantive offense." See aggravator (c)(8)—prior criminal conduct involving aggravated or repeated instances of assaultive behavior; aggravator (c)(12)—the defendant was on bail release for a felony or for a misdemeanor assault; aggravator (c)(16)—the defendant's criminal conduct was designed to obtain substantial pecuniary gain, and the defendant's risk of prosecution and punishment was slight; aggravator (c)(17)—the offense was one of a continuing series of criminal offenses from which the defendant derives a major portion of the defendant's income; aggravator (c)(18)(B)—the defendant is convicted of a sexual offense specified in AS 11.41.410–458, and the defendant has previously engaged in other sexual offenses under these same sections of the statutes; aggravator (c)(20)—the defendant was on felony probation, parole, or furlough; and aggravator (c)(21)—prior history of repeated similar criminal offenses.

The Supreme Court's decisions in *Graham* and *Oyler* strongly suggest that the Alaska Legislature would not violate the due process clause of the Fourteenth Amendment by establishing a procedure under which (1) matters independent of the defendant's guilt or innocence would alter the defendant's maximum sentence; (2) defendants would receive post-conviction notice that these matters were to be litigated, and (3) defendants would receive a separate post-conviction jury trial if these matters were contested (assuming that these matters were not exempted from the jury trial requirement by virtue of the *Blakely* exception for prior convictions).

■ Based on the Supreme Court's decisions in *Graham* and *Oyler*, we conclude that, even in states which guarantee a right of grand jury indictment to felony defendants, the due process clause of the Fourteenth Amendment does not require sentencing factors to be included in the indictment—even when, under *Apprendi* and *Blakely*, the Sixth and Fourteenth Amendments would require the states to give defendants a jury trial on those same factors.

Thus, if Dague is entitled to grand jury indictment on the aggravating factors listed in AS 12.55.155(c), that entitlement must arise under Article I, Section 8 of the Alaska Constitution—the provision of our constitution that guarantees the right of grand jury indictment.[76]

*Why we conclude that Article I, Section 8 of the Alaska Constitution does not guarantee grand jury indictment on aggravating factors*

Article I, Section 8 of the Alaska Constitution guarantees a right of grand jury indictment to all persons accused of felonies.[77] In elucidation of this guarantee, AS 12.40.100(a) declares that an indictment "must be direct

---

**76.** The pertinent portion of Article I, Section 8 states: "No person shall be held to answer for a capital, or otherwise infamous, crime unless on a presentment or indictment of a grand jury, except in cases arising in the armed forces in time of war or public danger."

**77.** Like the corresponding provision of the United States Constitution, Article I, Section 8 of the Alaska Constitution refers to the right of indictment for "capital" or "otherwise infamous"

crimes. The phrase "infamous crime" has long been construed to apply to all felonies. *See United States v. Powers*, 1 Alaska 180, 185–86 (D.Alaska 1901). This construction is now codified in Alaska Criminal Rule 7(a), which states that an indictment is required for any offense which is punishable by a term of imprisonment exceeding one year—*i.e.*, a felony. *See* AS 11.81.900(b)(24) (the definition of "felony").

and certain as it regards ... the particular circumstances of the crime charged when [those circumstances] are necessary to constitute a complete crime." And Alaska Criminal Rule 7(c) states that an indictment "shall be a plain, concise[,] and definite ... statement of the essential facts constituting the offense charged."

The question presented in Dague's case is whether the aggravating factors listed in AS 12.55.155(c) are "elements" of a defendant's underlying crime for purposes of grand jury indictment—whether, in the words of Criminal Rule 7(c), these aggravating factors constitute a portion of the "essential facts constituting the offense charged".

As we explained earlier in this opinion, the structure of Alaska's criminal code and presumptive sentencing law demonstrate that the legislature did not intend for the aggravating and mitigating circumstances codified in AS 12.55.155 to be characterized as elements of a crime. Recently, the legislature responded to *Blakely*—in particular, the suggestion that *Blakely* might be read to require grand jury indictment on aggravating factors—by adding a new subsection to AS 12.40.100, the statute that specifies the required contents of an indictment. This new subsection, AS 12.40.100(c), reaffirms the legislature's intention that aggravating factors not be treated as elements of a crime. AS 12.40.100(c) declares: "An indictment that complies with this section and with applicable rules adopted by the supreme court is valid and need not specify aggravating factors set out in AS 12.55.155."

Of course, the legislature's view of this matter is not controlling. We are dealing with a constitutional guarantee, and the provisions of our constitution override any contrary intention on the part of the legislature.

But as we explained earlier, this Court has repeatedly held (in *Hartley*, *Kelly*, and *State v. District Court*) that the aggravating factors are not elements of the underlying crime for purposes of pleading. Our decision in

*Hartley* is particularly important on this point—because, in *Hartley*, we considered and rejected the argument that the Alaska Supreme Court's decision in *Donlun* required us to treat the aggravating factors listed in AS 12.55.155(c) as elements of the offense.

As we explained in *Hartley*, the legislature created the aggravating and mitigating factors codified in AS 12.55.155 with the aim of eliminating unjustified disparity in felony sentencing, and for the related purpose of assuring that all felony sentencing decisions would be based on legally relevant sentencing criteria. Because of this, the aggravating and mitigating factors are not elements that the State can either pursue or refrain from pursuing, in the exercise of its prosecutorial discretion. Moreover, *Hartley* holds that a sentencing court has an independent duty to consider applicable aggravating factors even if the State does not raise them. In other words, the aggravating factors are not "elements" of the crime, at least as that concept is normally understood.

Indeed, in many instances, the aggravators listed in AS 12.55.155(c) will not even be the functional equivalent of elements for purposes of *proof*. *Apprendi* and *Blakely* hold that a defendant is entitled to a jury trial, and to proof beyond a reasonable doubt, if an aggravating factor will increase the defendant's potential maximum sentence. But many of the aggravating factors listed in AS 12.55.155(c) fall within *Blakely's* exemption for prior convictions; when these aggravators are established by the defendant's prior convictions, the defendant has no right to jury trial on these aggravators.[78]

Moreover, we recently held in *Cleveland v. State*, 143 P.3d 977, Alaska App. Opinion No.2060 (August 25, 2006), 2006 WL 2458578, that, under Alaska's pre-March 2005 form of presumptive sentencing (the version of the law at issue in Dague's case), *Blakely* only governs the proof of a single aggravating factor for each felony conviction. As we

---

**78.** *See, e.g., Cleveland v. State*, 143 P.3d 977, 982, Alaska App. Opinion No.2060 (August 25, 2006) (aggravator (c)(18)(B)); *Snelling v. State*, 123 P.3d 1096, 1098 (Alaska App.2005) (aggravator (c)(7)); *Greist v. State*, 121 P.3d 811, 814–15

(Alaska App.2005) (aggravator (c)(19)); *Grohs v. State*, 118 P.3d 1080, 1083–84 (Alaska App.2005) (aggravator (c)(21)); *Milligrock v. State*, 118 P.3d 11, 15–16 (Alaska App.2005) (aggravators (c)(7) and (c)(8)).

explained in *Cleveland,* under the pre–2005 presumptive sentencing law, proof of any single aggravating factor authorized the sentencing judge to impose any sentence of imprisonment up to the statutory maximum.[79] Thus, once a single *Blakely*-compliant aggravating factor is proved—either by jury verdict, or by the defendant's prior convictions, or by the defendant's express concession—the Sixth Amendment is satisfied, and all remaining aggravating factors can be litigated and proved in the manner specified by the pre-March 2005 version of AS 12.55.155.

Our decision in *Cleveland* reinforces the conclusion that, under the pre–2005 version of Alaska's presumptive sentencing law, the aggravating factors listed in AS 12.55.155(c) are not "elements" of the defendant's crime. *Cleveland* holds that the Sixth Amendment (as construed in *Blakely* ) may require one of these aggravators to be proved to a jury. But once a single *Blakely*-compliant aggravator is established, the remaining aggravators can be litigated in the manner provided in the pre–2005 version of the law—that is, litigated to the sentencing judge, and proved under a "clear and convincing evidence" standard.

The courts of several other states have confronted the question of whether the *Blakely* right to jury trial on aggravating factors carries with it a corresponding state-law right to grand jury indictment on those aggravating factors. With one exception, all of these courts have concluded that their state right to grand jury indictment does not apply to aggravating factors, even when a defendant has a Sixth Amendment right to jury trial on those same factors:

*See State ex rel. Smith v. Conn,* 209 Ariz. 195, 98 P.3d 881, 883–85 (Ariz.App.2004); *Banks v. State,* 842 So.2d 788, 793 (Fla.2003); *Terrell v. State,* 276 Ga. 34, 572 S.E.2d 595, 602 (2002); *People v. Davis,* 205 Ill.2d 349, 275 Ill.Dec. 781, 793 N.E.2d 552, 568–570 (2002); *Soto v. Commonwealth,* 139 S.W.3d 827, 842 (Ky.2004); *Baker v. State,* 367 Md. 648, 790 A.2d 629, 650 (2002); *Berry v. State,* 882 So.2d 157, 171–72 (Miss.2004); *Stevens v. State,* 867 So.2d 219, 227 (Miss.2003); *State v. Gilbert,* 103 S.W.3d 743, 747 (Mo.2003);

*Floyd v. State,* 118 Nev. 156, 42 P.3d 249, 256 (2002); *State v. Everette,* 172 N.C.App. 237, 616 S.E.2d 237, 242 (2005); *State v. Hunt,* 357 N.C. 257, 582 S.E.2d 593, 605–06 (2003); *State v. Pender,* 627 S.E.2d 343, 346 (N.C.App.2006); *Primeaux v. State,* 88 P.3d 893, 899–900 (Okla.Crim.App.2004); *State v. Sawatzky,* 339 Or. 689, 125 P.3d 722, 726–27 (2005); *State v. Heilman,* 339 Or. 661, 125 P.3d 728, 733–34 (2005); *State v. Cox,* 337 Or. 477, 98 P.3d 1103, 1115–16 (2004); *State v. Oatney,* 335 Or. 276, 66 P.3d 475, 485–87 (2003); *State v. Berry,* 141 S.W.3d 549, 558–562 (Tenn.2004); *State v. Holton,* 126 S.W.3d 845, 862–63 (Tenn.2004); *State v. Carter,* 114 S.W.3d 895, 910 n. 4 (Tenn.2003); *State v. Dellinger,* 79 S.W.3d 458, 466 (Tenn.2002); *Russeau v. State,* 171 S.W.3d 871, 885–86 (Tex.Crim.App.2005); *Rayford v. State,* 125 S.W.3d 521, 533 (Tex.Crim.App.2003); *Morrisette v. Warden of Sussex I State Prison,* 270 Va. 188, 613 S.E.2d 551, 556 (2005).

*Contra: State v. Fortin,* 178 N.J. 540, 843 A.2d 974, 1027–1038 (2004) (requiring that aggravating factors be charged in the indictment, as a matter of state law, but with prospective application only).

The Oregon Supreme Court's discussion of this point in *State v. Sawatzky,* 339 Or. 689, 125 P.3d 722 (2005), is particularly cogent and succinct:

> We agree with [the defendant] that *Apprendi* describes a "sentence enhancement" as "an increase beyond the maximum authorized statutory sentence" and "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." 530 U.S. at 494 n. 19, 120 S.Ct. [at 2365 n. 19]. [But] although *Apprendi* requires that the jury find the facts that would support an enhanced sentence, we do not agree that *Apprendi* requires, as a matter of state criminal procedure, that [sentence] enhancement factors be set out in the indictment.
>
> . . .
>
> Nothing in *Apprendi* or *Blakely* alters the definition of an "offense" set out in [Oregon Statute] 161.505. In our view, so

---

**79.** *Cleveland,* 143 P.3d at 987–988, Alaska App.

Opinion No.2060.

long as a defendant has timely notice that the state intends to prove certain aggravating or enhancing factors necessary for the imposition of a sentence that exceeds the [otherwise applicable] presumptive range, and the trial court affords [the] defendant the opportunity to exercise his or her jury trial right [on these issues], the federal constitution is satisfied.

*Sawatzky*, 125 P.3d at 727.

■ For the reasons we have explained here, we align ourselves with the near-unanimous majority of other state courts on this issue. We hold that the aggravating factors listed in AS 12.55.155(c) are not elements of a felony offense for purposes of Alaska's guarantee of grand jury indictment.

■ Of course, defendants have a due process right to adequate notice of the applicable aggravators, and to an adequate opportunity to litigate these aggravators if the defendant chooses to contest them. This principle is easy to state in the abstract, but harder to apply to particular cases.

■ Dague's case provides an example of a problematic situation: a defendant is indicted and tried for an offense that is not governed by presumptive sentencing, but the defendant is found guilty of a lesser offense that *is* governed by presumptive sentencing—thus making aggravating and mitigating factors legally relevant for the first time.

In recent legislation, the Alaska Legislature has declared that defendants in this situation should receive notice of proposed aggravating factors "within 48 hours, or at a time specified by the court, if the court instructs the jury about the option to return a verdict for a lesser included offense". AS 12.55.155(f)(2)(B).

Conceivably, depending on the circumstances, this short notice might not be sufficient to allow the defendant a fair opportunity to litigate a proposed aggravating factor. If so, then the superior court would confront the question of whether to recess the trial or delay the jury's deliberations (to give the defendant more time to prepare) or, instead, allow the jury to deliberate on the underlying

crimes and then convene a second jury to deal with the contested aggravating factor.

We note these issues, but we need not resolve them here. In Dague's case, the presence of aggravating and mitigating factors did not become a live issue until the jury acquitted Dague of second-degree murder and found her guilty of manslaughter. (At the time of Dague's trial, the legislature had not yet amended AS 12.55.155(f) to require the State to give notice of proposed aggravating factors within 48 hours after the trial judge decides to instruct the jury on lesser included offenses.) The State proposed aggravator (c)(5) on the first business day following the jury's verdict: October 4, 2004. At Dague's request, the superior court dismissed the jury, leading to the present appellate proceedings. Dague's sentencing has now been delayed by almost two years on account of this appellate litigation. Under these circumstances, Dague has had adequate notice of aggravator (c)(5).

Accordingly, our decision is confined to the narrow issue of whether, under the Alaska Constitution, aggravating factors must be pleaded in the indictment. We hold that they need not be.

*The superior court will not violate Dague's rights under the double jeopardy clause if the court now holds a jury trial on the aggravating factor alleged by the State*

■ One final issue remains to be decided: whether the double jeopardy clause forbids the superior court from holding a second jury trial on the aggravating factor proposed by the State in Dague's case. To explain this issue, we must briefly recapitulate the procedural history of Dague's case.

As we explained early in this opinion, Dague was indicted and tried for second-degree murder, following the death of a ten-month-old infant left in her care. The offense of second-degree murder was governed by indeterminate sentencing. In other words, if Dague had been convicted of second-degree murder, the presence or absence of aggravating and mitigating factors would have had no effect on the court's sentencing authori-

ty.[80]  But the jury acquitted Dague of second-degree murder and found her guilty of the lesser offense of manslaughter. Manslaughter is a class A felony offense, and it is governed by presumptive sentencing. As a first felony offender, Dague faced a presumptive term of 5 years' imprisonment, and the court had no authority to impose any higher sentence unless the State proved one or more of the aggravating factors listed in AS 12.55.155(c).

After the jury returned its verdict, the State asked Judge Volland to hold Dague's jury over the weekend, until Monday, so that the jury could consider any aggravating factors that applied to Dague's crime. Dague responded that the State was barred from pursuing aggravating factors because no aggravating factors had been alleged in the indictment. She argued in the alternative that, even if aggravating factors did not have to be pleaded in the indictment, she nevertheless had received insufficient notice of whatever aggravators the State might propose.

Judge Volland agreed to hold the jury over until Monday—at which time he would hear arguments from the parties on two issues: whether aggravators needed to be pleaded in the indictment, and whether it was feasible to delay Dague's jury trial to resolve the various legal issues surrounding the State's post-verdict proposal of aggravating factors.

When the parties re-assembled in court on Monday, the State proposed aggravator (c)(5)—that Dague "knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to … extreme youth".

Dague argued that, because of the United States Supreme Court's decision in *Blakely*, she was entitled to grand jury indictment on any aggravating factor. Dague also contended that she was prejudiced by the lack of pre-trial notice of the proposed aggravator. She asserted that she had been unable to plan her trial strategy so as to counter the proposed aggravator, and she also asserted that the State's post-verdict notice of the aggravator hampered her ability to "make strategic decisions on how to prepare for sentencing". Dague also argued that she was entitled to have the same jury decide the proposed aggravating factor, and she contended that the State's post-verdict notice of the aggravator made it impracticable to hold the jury. For all of these reasons, Dague asked the superior court to discharge the jury and bar the State from pursuing the proposed aggravator.

Judge Volland granted Dague's request to discharge the jury, and he further ruled that the State was barred from pursuing its proposed aggravator with any later jury.

Dague now argues that Judge Volland's resolution of this matter was mandated by the double jeopardy clause of the federal and state constitutions. (Dague makes no separate argument based on the Alaska double jeopardy clause; rather, she makes a unified argument that depends primarily on cases interpreting the federal double jeopardy clause.)

The underlying premise of Dague's double jeopardy argument is the assertion that the State's proposed aggravating factor, (c)(5), must be deemed an additional "element" of her offense. Based on this premise, Dague argues that, in essence, the State is now attempting to bring her to trial on a charge of "aggravated manslaughter", a new and greater offense than the "non-aggravated manslaughter" reflected in the jury's verdict. And Dague argues that the double jeopardy clause forbids the government from taking a defendant to trial on a criminal charge and then, following the verdict, charging the defendant with a new, higher degree of the same crime.

We have already explained, at length, why we conclude that Dague's premise is wrong—why the aggravating factors listed in AS 12.55.155(c) are not elements of the felony offenses governed by presumptive sentencing.

As we recently noted in *Cleveland v. State*, the proof of any single aggravating factor is sufficient to authorize a sentencing judge to exceed the prescribed presumptive term and impose any sentence up to the statutory max-

**80.** *Allen v. State,* 56 P.3d 683, 684–85 (Alaska App.2002).

imum. Thus, depending on the circumstances of a defendant's case, the *first* aggravating factor to be proved may be viewed as the "functional equivalent" of an element for the limited purpose of assessing the defendant's right to jury trial under the Sixth Amendment. But aggravating factors are not "elements" for other purposes.

In particular, *Hartley* and *Kelly* hold that, for purposes of indictment and pre-trial notice, aggravating factors are not elements of the defendant's underlying crime. Thus, the crime of manslaughter without proof of aggravating factors is not a "lesser offense" included within a purportedly distinct crime of "manslaughter accompanied by proof of aggravators". Dague's offense is manslaughter, and the presence or absence of aggravating factors does not alter this—just as the presence or absence of *mitigating* factors would not alter it, even though the court's sentencing range would be changed (to Dague's benefit) if one or more mitigating factors were proved.

Moreover, as we explained in the preceding section of this opinion, in both *Graham v. West Virginia* and *Oyler v. Boles* the United States Supreme Court rejected a double jeopardy attack on a "habitual criminal" law that authorized the imposition of substantially increased penalties for felony offenses if the defendant had prior felony convictions. West Virginia law allowed the State to give notice of its intent to prove these prior convictions *after* the defendant was convicted of the underlying offense, and it allowed the State to litigate these prior convictions at a separate trial in front of a second jury. In both *Graham* and *Oyler*, the Supreme Court declared that this procedure did not violate the double jeopardy clause.

As the Supreme Court explained in *Oyler*, the fact that the defendant may have prior felony convictions "is essentially independent of the determination of [the defendant's] guilt on the underlying substantive offense"—"a distinct issue [that] may appropriately be the subject of separate determination". *Id.*, 368 U.S. at 452, 82 S.Ct. at 503–04.

See also *Spencer v. Texas*, 385 U.S. 554, 566, 87 S.Ct. 648, 655, 17 L.Ed.2d 606 (1967), where the Supreme Court noted that, in some states, a sentence enhancement proceeding "can be instituted even after [the defendant's] conviction on the new substantive offense", and the Court declared that "[t]olerance for a spectrum of state procedures dealing with [this] common problem of law enforcement is especially appropriate".

Although the decisions in *Graham* and *Oyler* involved a statute that called for an enhanced sentence based on the defendant's prior convictions, the wording of *Graham* and *Oyler* suggests that the Supreme Court would adhere to the same double jeopardy rule—that is, the Supreme Court would allow a separate, post-verdict jury trial—whenever the sentence enhancement was based on facts "essentially independent of the determination of guilt on the underlying substantive offense". *Oyler*, 368 U.S. at 452, 82 S.Ct. at 503.

As we pointed out earlier in this opinion, such a rule would cover several of the aggravating factors listed in AS 12.55.155(c)—the aggravators dealing with issues such as whether the defendant was on probation, parole, or bail release at the time of the offense, or whether the defendant had a history of similar offenses or assaultive behavior. We concede, however, that it is not clear whether the aggravating factor at issue in Dague's case, aggravator (c)(5), should be deemed "essentially independent of the determination of [Dague's] guilt on the underlying substantive offense".

Aggravator (c)(5) applies to cases in which the defendant was aware, or reasonably should have been aware, that the victim of the offense was particularly vulnerable (here, the potential vulnerability arising from the victim's extreme youth). Technically, this issue of fact is not among the elements of either second-degree murder (the offense for which Dague was indicted) or manslaughter (the lesser offense that she was convicted of). However, it seems almost inevitable that the victim's extreme youth was one of the factors that the jurors considered when they assessed Dague's culpable mental state—that is, when they decided whether Dague acted with extreme indifference to the value of human life (the culpable mental state for

second-degree murder) or recklessness (the culpable mental state for manslaughter).

But even if we assume that the issue of fact presented by aggravator (c)(5) does not qualify as "essentially independent" of the issues litigated at Dague's trial, and if we further assume that Dague was entitled to have a single jury decide both her guilt of manslaughter and the presence or absence of the State's proposed aggravating factor, we still conclude that, given the circumstances of Dague's case, it will not violate Dague's rights under the double jeopardy clause for us to remand this case to the superior court for a jury trial on the State's proposed aggravating factor.

Dague's jury was not asked to decide aggravator (c)(5), so the jury never explicitly ruled on this issue. Nor do the jury's verdicts in Dague's case—finding her not guilty of second-degree murder, but finding her guilty of manslaughter—constitute an implicit finding in Dague's favor on proposed aggravator (c)(5). Although the jury acquitted Dague of second-degree murder, this acquittal is consistent with the conclusion that Dague knew or should have known that the infant was particularly vulnerable. The jury found that Dague committed manslaughter—that she acted recklessly when she caused the infant's death. Under the definition of "recklessly" codified in AS 11.81.900(a)(3), a person commits a reckless homicide if they are aware of, and consciously disregard, a substantial and unjustifiable risk that their conduct will lead to the death of another. Thus, the jury's verdicts are not an implied rejection of aggravator (c)(5); rather, these verdicts are consistent with aggravator (c)(5).

Because the jury's verdicts do not constitute an implicit rejection of aggravator (c)(5)—that is, because these verdicts do not constitute an implicit "acquittal" on aggravator (c)(5)—the verdicts themselves do not bar the State from pursuing further proceedings against Dague to prove this aggravator. Accordingly, if the double jeopardy clause protects Dague from further litigation of this issue, that protection must arise from the double jeopardy clause's guarantee against successive prosecutions. Thus, the remaining question is whether the convening of a second jury to decide aggravator (c)(5) would constitute a "successive prosecution" for double jeopardy purposes.

As we explained above, the Supreme Court held in *Graham* and *Oyler* that, in many instances, a state may subject a defendant to a separate, second trial on sentencing factors without violating the double jeopardy clause. But even assuming that aggravator (c)(5) does not fall within the category of aggravating factors for which two separate trials are expressly allowed under *Graham* and *Oyler*, the fact remains that the State did not seek to subject Dague to two separate trials. Rather, immediately after the jury found Dague guilty of manslaughter—an offense governed by presumptive sentencing—the State asked the superior court to hold Dague's jury so that the same jurors could consider the State's proposed aggravating factor. In other words, the State sought a continuation of Dague's trial, with the same jury, as soon as Dague's conviction for manslaughter triggered presumptive sentencing (thus raising the issue of aggravating and mitigating factors).

The trial did not continue—because Dague opposed the State's request. She argued that she was entitled to grand jury indictment on any aggravating factors, and that it was too late for the State to amend the indictment by adding aggravating factors—because if any aggravating factors were added to the indictment, the amended indictment would effectively charge a new and greater offense. Based on these arguments, Dague asked the superior court to dismiss her jury—and the superior court did so.

By expressly asking the superior court to dismiss the jury, Dague waived any right she might otherwise have had to insist that a single jury decide both her guilt of the homicide and the State's proposed aggravating factor. Her trial has been divided in two because of her own efforts.

Accordingly, it will not violate the double jeopardy clause for us to remand Dague's case to the superior court for a jury trial on the disputed aggravating factor. Again, we agree with the Oregon Supreme Court's analysis of this question in *Sawatzky:*

[A new jury trial on aggravating circumstances] is not a second prosecution. Rather, it is a sentencing proceeding on remand—a continuation of a single prosecution. *See State v. Montez,* 309 Or. 564, 604, 789 P.2d 1352 (1990) ("A penalty phase hearing is merely a continuation of the same trial and not a separate or collateral proceeding threatening a new or different sanction"). Because it is [the defendant] who challenged the legality of her sentences . . ., she cannot now claim that she had any justifiable expectation of finality—a fundamental jeopardy requirement—with respect to her sentences.

. . .

We hold that [the defendant] has no . . . constitutional [double] jeopardy right that prohibits the empaneling of a[new] jury to determine whether certain aggravating factors may support the imposition of sentences that exceed the presumptive range for the crimes to which [the defendant] pleaded guilty.

*Sawatzky,* 125 P.3d at 726–27.

*Judge Volland's alternative ground for preventing the State from litigating the aggravating factor*

In addition to the legal issues that we have discussed here, Judge Volland barred the State from pursing aggravating factor (c)(5) because he believed that, if this aggravating factor were litigated, Dague would be required to re-summon the expert witnesses who testified at trial regarding her mental state, and he concluded that it would be fundamentally unfair to require Dague to bear the additional expense of bringing these witnesses back to Alaska.

We are not certain why Judge Volland believed that these expert witnesses would be crucial to the jury's decision on aggravator (c)(5). Although the jury's decision on the charges of second-degree murder and manslaughter required an evaluation of Dague's subjective mental state, aggravator (c)(5) is proved if the defendant "knew *or reasonably should have known* that the victim of the offense was particularly vulnerable

or incapable of resistance due to . . . extreme youth". That is, aggravator (c)(5) does not focus on the defendant's subjective mental state; rather, it incorporates an objective, negligence test.

In any event, Dague does not rely on this aspect of Judge Volland's ruling in this appeal.

*Conclusion*

We acknowledge that defendants have a due process right to advance notice of the State's proposed aggravating factors and a sufficient opportunity to prepare for litigation if the defendant intends to dispute these aggravating factors. But to resolve Dague's case, we need not define the precise contours of this due process right. Dague's case presents a narrower issue: whether the State's proposed aggravating factors must be charged in the defendant's indictment.

For the reasons explained here, we conclude that even when the Sixth Amendment, as interpreted in *Blakely v. Washington,* guarantees a defendant the right to jury trial on an aggravating factor listed in AS 12.55.155(c), that aggravating factor is not an element of the defendant's crime for purposes of the grand jury clause of the Alaska Constitution.

We further conclude that, under the facts of Dague's case, a second jury trial addressed to aggravator (c)(5) will not violate the guarantee against successive prosecutions embodied in the double jeopardy clause of the federal and state constitutions.

We REVERSE the decision of the superior court, and we remand Dague's case to the superior court to allow the parties to litigate proposed aggravating factor AS 12.55.155(c)(5) before Dague is sentenced for manslaughter.